# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
May 3, 2022

Lyle W. Cayce
Clerk

No. 20-30406

Michael Wearry,

*Plaintiff—Appellee*,

*versus*

Paulette H. Foster, *as the Personal Representative of Appellant* Marlon Kearney Foster, *for substitution in the place and stead of the Appellant* Marlon Kearney Foster, *deceased*; Scott M. Perrilloux, *in his Individual Capacity and in his Official Capacity as District Attorney for the 21st Judicial District of Louisiana*; Kearney Matthew Foster, *as the Personal Representative of Appellant* Marlon Kearney Foster, *for substitution in the place and stead of the Appellant* Marlon Kearney Foster, *deceased*; William Aaron Foster, *as the Personal Representative of Appellant* Marlon Kearney Foster, *for substitution in the place and stead of the Appellant* Marlon Kearney Foster, *deceased*; Annette Foster Alford, *as the Personal Representative of Appellant* Marlon Kearney Foster, *for substitution in the place and stead of the Appellant* Marlon Kearney Foster, *deceased*,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:18-CV-594

Before King, Dennis, and Ho, *Circuit Judges*.

Jᴀᴍᴇꜱ L. Dᴇɴɴɪꜱ, *Circuit Judge*:

After the Supreme Court overturned Michael Wearry's Louisiana capital murder conviction, *Wearry v. Cain*, 577 U.S. 385 (2016), Wearry brought this §§ 1983 and 1988 suit against the state prosecutor and a sheriff's detective, alleging that they fabricated evidence that deprived him of due process and a fair trial. Defendants, District Attorney Scott Perrilloux and Livingston Parish Sheriff's Detective Marlon Foster, each moved to dismiss for failure to state a claim under Rule 12(c) based on assertions of absolute prosecutorial immunity. The district court denied the motions, holding that neither defendant was entitled to absolute immunity for fabricating evidence by intimidating and coercing a juvenile to adopt a false narrative the defendants had concocted out of whole cloth.

We agree with the district court that Wearry's complaint alleges misconduct that is fundamentally investigatory in nature. When a prosecutor joins police in the initial gathering of evidence in the field, he acts outside his quasi-judicial role as an advocate; instead he acts only in an investigatory role for which absolute immunity is not warranted. Therefore, District Attorney Perrilloux is not entitled to absolute immunity for his actions. Nor is Detective Foster absolutely immune. As the Supreme Court has made clear, a police officer is not entitled to the absolute immunity reserved for a prosecutor. We AFFIRM the district court's rulings.

## I.

On the evening of April 4, 1998, Eric Walber, a high school honors student, was carjacked and brutally murdered on a deserted stretch of roadway in Livingston Parish while delivering pizza. For several years the crime went unsolved, generating national media attention and criticism of law enforcement in Livingston Parish. Then, in June 2000, Wearry was charged with Walber's murder. Wearry, whose alibi was that he was at a wedding in Baton Rouge on the night of the murder, had been initially dismissed as a suspect by law enforcement. But in April 2000, a jailhouse

informant came forward claiming to have information linking Wearry to Walber's murder. Without any physical evidence directly connecting Wearry to the crime, a unanimous jury voted to convict Wearry and sentenced him to death. Sixteen years later, the United States Supreme Court overturned Wearry's conviction, stating that newly revealed *Brady* evidence undermined confidence in the State's case against him, which resembled "a house of cards." *Wearry*, 577 U.S. at 392.

Wearry then filed this lawsuit seeking damages from Detective Foster and District Attorney Perrilloux. He alleged that the officials fabricated evidence against him in his murder prosecution in violation of the Fourteenth Amendment and Louisiana state law by coercing a vulnerable juvenile to adopt, and eventually testify to, a false story concocted entirely by the Detective and the District Attorney. Since the applicability of absolute immunity turns on whether the misconduct in question is advocatory or not, we recount the allegations of the complaint in detail. And since this appeal comes to us from a Rule 12(c) motion, we "assume [Wearry's] allegations are entirely true." *Buckley v. Fitzsimmons*, 509 U.S. 259, 261 (1993).

In December 2001, two and a half years after Walber's murder, Detective Foster pulled Jeffery Ashton out of school without his mother's permission and detained him at District Attorney Perrilloux's office. Ashton was barely a teenager at the time. Over the course of at least six separate meetings beginning three months before trial, Foster and Perrilloux intimidated the child, who was facing his own juvenile proceedings, into adopting a story they had invented that placed Wearry near the crime scene at the time of the murder. At one meeting, the District Attorney and Detective falsified the results of a photo array lineup, indicating that the child had identified Wearry as the person he had seen in the fabricated story. In truth Ashton had told the officials he did not recognize Wearry after they pointed him out in the photo array. At another meeting, Foster took the child

to see the victim's blood-stained car. Before and after each of these meetings, Perrilloux and Foster met to confer upon their efforts to pressure Ashton into adopting and testifying to the story they fabricated.

Nothing in the story the defendants invented was based on information the child had provided to the Detective or the District Attorney. As Wearry's complaint plainly puts it, "Perrilloux and Foster made an intentional and deliberate decision to fabricate a narrative." In the District Attorney and Detective's narrative, Ashton had gone to a "musician appreciation" function at his church on the night of the murder. According to the false narrative, as he walked home alone, he heard footsteps and hid under a house. Following their script, Ashton testified that he then saw Wearry throw Walber's cologne bottle into a ditch and get into Walber's car. In reality, Ashton had been at a strawberry festival with his older sister in Ponchatoula miles away from the scene on the night of Walber's murder. Ashton had spent the night with his sister in Hammond without coming back to Livingston Parish. Ashton had never seen Wearry before Foster and Perrilloux presented Wearry's photo to him, and Ashton "had no personal knowledge" of any facts implicating Wearry in the murder, including the fabrications invented by the defendants. In short, Foster and Perrilloux knowingly "provided the adolescent with a completely fabricated story" and intimidated and coerced him to adopt and repeat the story in his testimony.[1]

---

[1] After Wearry's conviction was reversed by the Supreme Court in 2016, Perrilloux decided to try him again. Perrilloux and the Livingston Parish Sheriff's Office maintained pressure on Ashton to adhere to the false story and to avoid talking to Wearry's attorneys or agents. On September 28, 2016, Ashton was arrested for probation violations and incarcerated in the Livingston Parish Jail for several months. On November 20, 2017, however, Ashton testified under oath at an evidentiary hearing that his testimony in Wearry's murder trial was a false narrative fabricated by Perrilloux and Foster and that he only adopted that narrative because he feared that he or his family would be harmed.

No. 20-30406

In the district court, Perrilloux moved first to dismiss Wearry's suit arguing that he was entitled to absolute immunity because the allegations in the complaint described actions traditional to a prosecutor's role as an advocate for the state. The district court denied Perrilloux's motion, concluding that the alleged scheme to fabricate evidence fell outside of the prosecutorial functions protected by absolute immunity. Detective Foster then filed a Rule 12(c) motion for judgment on the pleadings, arguing that he, a sheriff's detective, was due the absolute immunity just denied to the District Attorney. Perrilloux filed his own Rule 12(c) motion the next day, stating only that "[f]or the same bases as are set forth in the similar motion filed" by Foster, the court should grant Perrilloux absolute immunity and judgment on the pleadings. The district court denied both motions. The defendants filed this interlocutory appeal of the district court's denial of their identical Rule 12(c) motions.

## II.

The denial of absolute immunity on a § 1983 claim may be immediately appealed "to the extent that it turns on an issue of law," as a "final decision." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Similarly, an order denying immunity under state law is immediately appealable as a final decision, so long as "the state's doctrine of qualified immunity, like the federal doctrine, provides a true immunity from suit and not a simple defense to liability." *Sorey v. Kellett*, 849 F.2d 960, 962 (5th Cir. 1988). Louisiana's doctrine of prosecutorial immunity is, like the federal doctrine, one of true immunity from suit. The Louisiana Supreme Court, in a decision relying heavily on the foundational U.S. Supreme Court cases *Imbler v. Pachtman*, 424 U.S. 409 (1976) and *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), held that absolute prosecutorial immunity "will defeat a suit at the outset." *Knapper v. Connick*, 681 So. 2d 944, 948 (La. 1996). As a result, this court has heard interlocutory appeals from denials of absolute prosecutorial

immunity involving federal and Louisiana state law claims. *See, e.g.*, *Singleton v. Cannizzaro*, 956 F.3d 773 (5th Cir. 2020).

We review a district court's denial of a Rule 12(c) motion for judgment on the pleadings de novo. *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "The standard for dismissal under Rule 12(c) is the same as that for dismissal for failure to state a claim under Rule 12(b)(6)." *Id.* In reviewing the denial of Rule 12(c) motions on immunity grounds, we review the sufficiency of the pleadings, accepting the allegations of the complaint as true and viewing them in the light most favorable to the plaintiff. *Johnson*, 385 F.3d at 529. "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991) (citations omitted).

## III.

Although 42 U.S.C. § 1983 "on its face admits of no defense of official immunity," it has long been recognized by the Supreme Court that Congress did not intend to abrogate immunities "well grounded in history and reason" by omission. *Buckley*, 509 U.S. at 268; *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951). As a result, two kinds of immunity are now well-established by decisional law in the Supreme Court and this circuit—qualified immunity and absolute immunity. The defendants in the present case claim only absolute immunity, which is analyzed under the "functional approach." *Buckley*, 509 U.S. at 269. This approach looks first to "the immunity historically accorded the relevant official at common law" and then identifies the "functions" of that historical official whose contemporary analogues should be afforded the same immunity. *Id.* For instance, it is "well-settled" that historically prosecutors were absolutely immune in their decision to initiate criminal proceedings. *Imbler v. Pachtman*, 424 U.S. 409, 421–24

(1976).² Accordingly, a contemporary prosecutor's charging decision is protected by absolute immunity by virtue of being the functional equivalent of the activity protected at common law. *Id.* at 430. In contrast, a prosecutor's "investigative activities" are not entitled to absolute immunity because investigation was not "part of [a prosecutor's] traditional official functions." *Id.* at 430; 416. *See also Burns*, 500 U.S. at 489–90 (holding that because prosecutors were absolutely immune for eliciting false testimony from witnesses in court at common law, contemporary prosecutors are absolutely immune for eliciting misleading witness testimony during probable cause hearings); *Rehberg v. Paulk*, 566 U.S. 356, 363 (2012) (listing Supreme Court cases applying the functional approach). The Supreme Court has decided to maintain absolute immunity for contemporary prosecutors' advocatory functions because "harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his

---

² As the Supreme Court has itself recognized, its development of the doctrine of absolute prosecutorial immunity has departed slightly from the strict historical methodology of identifying common law immunities that existed in 1871—the year of § 1983's predecessor's enactment—and analogizing them to contemporary officials. In 1871, "it was common for criminal cases to be prosecuted by private parties." *Rehberg v. Paulk*, 566 U.S. 356, 364 (2012). The public prosecutor, at least as we understand the office today, did not exist in 1871, although a variety of other public officials fulfilled some of the same functions. *See* John H. Langbein, *The Origins of Public Prosecution at Common Law*, 17 AM. J. LEGAL HIST. 313 (1973); Jack M. Kress, *Progress and Prosecution*, 43 ANNALS AM. ACAD. POL. & SOC. SCI. 99 (1976). But in "the decades after the adoption of the 1871 Civil Rights Act…the prosecutorial function was increasingly assumed by public officials." *Rehberg*, 566 U.S. at 365. "Thus, when the issue of prosecutorial immunity under § 1983 reached this Court in *Imbler*, the Court did not simply apply the scope of immunity recognized by common-law courts as of 1871 but instead placed substantial reliance on post–1871 cases extending broad immunity to public prosecutors sued for common-law torts." *Id.* at 366. Despite this unusual broadening of the relevant historical record, the Supreme Court has repeatedly affirmed the availability of absolute immunity to prosecutors for acts "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430.

public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler*, 424 U.S. at 423.

## A.

As discussed above, the functional approach distinguishes between investigatory actions and advocatory ones, with only the latter due absolute immunity. *Singleton v. Cannizzaro*, 956 F.3d 773, 780 (5th Cir. 2020) (citing *Buckley*, 509 U.S. at 272–73). The bare labels "advocatory" and "investigatory," however, are of limited utility. A distinction more sensitive to the facts of this case is that between the advocatory function of organizing, evaluating, and presenting evidence, and the separate investigatory function of gathering or acquiring evidence. *See Barbera v. Smith*, 836 F.2d 96, 101 (2d Cir. 1987). "[I]nformation-gathering," this court has recognized, "is more analogous to investigative police work than advocatory conduct." *Singleton*, 956 F.3d at 783. In contrast, evaluating and presenting already-gathered evidence before a judicial tribunal are "quasi-judicial functions" that qualify for absolute immunity. *Id.* at 780. At its core, the advocatory function is one that is "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. Conduct that is unrelated to the judicial phase of a prosecution, or of only attenuated relation, cannot be said to be advocatory. *Burns*, 500 U.S. at 494 ("absolute prosecutorial immunity" is only justified "for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct").

We can map the allegations in Wearry's complaint onto this dichotomy by following the Supreme Court's decision in *Buckley v. Fitzsimmons*. That case also involved a conspiracy to fabricate evidence through false witness testimony. 509 U.S. at 262. There, the prosecutor searched for a witness who would testify that a bootprint found at the crime

scene matched that of the petitioner's boot. *Id.* After going through several experts at state-administered institutions who concluded the two bootprints did not match, the prosecutor located a witness "well known for her willingness to fabricate unreliable expert testimony." *Id.* at 262. The issue, as framed by the lower courts, was "whether the effort to obtain definitive boot evidence linking petitioner to the crime was in the nature of acquisition of evidence or in the nature of evaluation of evidence for the purpose of initiating the criminal process." *Id.* at 264–65 (cleaned up). The Supreme Court held that this conduct was investigatory, and therefore absolute immunity was not available. *Id.* at 276. As the Court framed the distinction: "There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Id.* at 273. The prosecutor's search for false witness testimony fell into the latter category.

We can discern no meaningful difference between the prosecutor's fabrication of evidence in *Buckley* and the fabrication alleged here. Both involved, at bottom, a search for false witness testimony for use as evidence. As the Ninth Circuit put it succinctly: "Shopping for a dubious expert opinion is fabricating evidence, which is unprotected by absolute immunity. It follows, then, that acquiring known false statements from a witness for use in a prosecution is likewise fabricating evidence that is unprotected by absolute immunity." *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001) (internal citation to *Buckley* removed). If anything, the allegations in Wearry's complaint make out a more extreme conspiracy to manufacture false evidence than the one presented in *Buckley*.

In *Buckley*, the prosecutor acquired false witness testimony to corroborate his theory of the physical evidence recovered from the crime

scene. 509 U.S. at 272. Foster and Perrilloux detained and coerced Ashton into falsely testifying to a narrative that had no basis in any evidence gathered in the case, physical or testimonial.[3] In fact, the defendants are alleged to have altered evidence. When Ashton's repeated statements to the Detective and District Attorney varied from their prescribed narrative, the officials concealed those statements. Ashton did not identify Wearry in a nine-person photo array, but instead identified others in the array. And even when the Detective and District Attorney pointed out Wearry's photo to Ashton and asked about it specifically, Ashton stated that he did not recognize him. Yet the narrative presented by the Detective and District Attorney included Ashton's positive identification of Wearry.[4] Thus, while the prosecutor in *Buckley* shopped for false testimony to support his physical evidence theory, the defendants here falsified a witness's statements themselves. Finally, Foster and Perrilloux's campaign to intimidate and coerce a vulnerable child into falsely testifying against Wearry occurred over the course of at least six meetings, well in excess of the three expert studies the prosecutors in *Buckley* went through before finding the one they wanted. *Id.* at 262. In both scope and sheer calculation, the fabrication alleged in this case exceeds that in *Buckley*.

---

[3] We are mindful that this appeal comes to us from a motion for judgment on the pleadings. We are thus limited to considering the allegations in the complaint which, after a careful examination, reveal no connection between the testimony Foster and Perrilloux forced Ashton to adopt and the other elements of the investigation.

[4] A photo array lineup is a classic investigatory technique. *See* CHARLES O'HARA, FUNDAMENTALS OF CRIMINAL INVESTIGATION 600–603 (1970) (describing various lineup techniques used in investigation); *see also Miranda v. Arizona*, 384 U.S. 436, 448 (1966) ("A valuable source of information about present police practices, however, may be found in various police manuals and texts which document procedures employed with success in the past, and which recommend various other effective tactics.") (citing to O'Hara in footnote 9).

There is one noteworthy difference between Wearry's case and *Buckley*. Namely, the prosecutors in *Buckley* lacked probable cause to indict Buckley at the time they fabricated the evidence, while here Wearry had already been charged. But the existence of probable cause is not a bright-line rule, as *Buckley* itself recognized that "a prosecutor may engage in 'police investigative work'" even after probable cause has been found. *Buckley*, 509 U.S. 274 n.5 (1993). As this court stated recently, "[t]he Supreme Court has never held that the timing of a prosecutor's actions controls whether the prosecutor has absolute immunity. Instead, the Court focuses on the function the prosecutor was performing." *Singleton*, 956 F.3d at 783. And the function performed by a prosecutor in fabricating evidence is evidence *creation*, which is not part of the advocate's role, but a corruption of the investigator's function of "searching for clues and corroboration." *Buckley*, 509 U.S. at 273. The fact that Wearry's trial was only three months away when the defendants first pulled Ashton out of school to transform him into a prosecution witness does not change the fundamental nature of their actions.

Perrilloux repeatedly characterizes Wearry's allegations of evidence fabrication as an "effort to control the presentation of witness testimony at trial." We reject this contention. Fabricating false testimony is not "controlling" a witness's testimony any more than issuing a fake subpoena to compel a witness's appearance is "controlling" her testimony. *Singleton*, 956 F.3d at 783. What is alleged here is not simply that Foster and Perrilloux elicited false testimony from Ashton through improper means, but rather that they invented a false narrative and then coerced a vulnerable juvenile to adopt and testify to it in court. Based on Wearry's complaint, it does not even appear that Ashton was a witness in the State's case against Wearry until the defendants decided to use the child to present their fabricated evidence. Their initial intimidation of Ashton could not be an effort to control a witness

when the child was not even yet a witness. It is the fabrication of false evidence, and not merely the perjury elicited at trial, that is the misconduct at issue here.

Related to this, Perrilloux argues, indeed "most importantly," that the eventual use of the fabricated evidence at trial demonstrates that the misconduct was advocatory in nature. The Supreme Court has rejected this argument, noting the moral hazard it would create. *See Buckley*, 509 U.S. at 276 (1993) ("[E]very prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial."); *see also Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) (a "prosecutor cannot retroactively immunize himself from conduct by perfecting his wrong-doing through introducing the fabricated evidence at trial"). Perrilloux's use-at-trial motive does not change the nature of his actions or convert the fabrication of evidence into a quasi-judicial act of advocacy.[5]

## B.

Perrilloux's argument for absolute immunity relies most heavily on this court's previous decision in *Cousin v. Small*, 325 F.3d 627 (2003). That case, like this one, involved false witness testimony. But unlike the present case, *Cousin* did not involve the invention of a false narrative by the prosecutor, or the imposition of that narrative through a campaign of intimidation and coercion.[6] Indeed, the *Cousin* court noted that, under

---

[5] Our brother's *dubitante* opinion argues strenuously that, under our circuit's precedent, if the prosecutor intended to use the fabricated evidence at trial, then he is entitled to absolute immunity. But at least since *Buckley* it has been clear that is not the law. No circuit, including our own, has deviated from this rule. *See, e.g.*, *Wooten v. Roach*, 964 F.3d 395, 409 (5th Cir. 2020).

[6] Our brother claims that the prosecutor in *Cousin* did invent a false narrative, just like the prosecutor and detective here. *Infra* at 24. But, tellingly, our brother never says

No. 20-30406

certain circumstances, a prosecutor's instructions to a witness to testify falsely could be investigatory. *Id.* at 364. However, several key facts "eliminat[ed]" any "ambiguity" as to whether the prosecutor was functioning as an advocate in that case. *Id.*

At the outset we must note, as our court has recognized before, that the *Cousin* opinion's analysis contains a significant legal error. The *Cousin* court found that the plaintiff, Cousin, failed to meet his burden of demonstrating that absolute immunity was not applicable. As our court has since recognized, the *Cousin* court erred in imposing the burden of proof on the plaintiff. *See Hoog-Watson v. Guadalupe Cty., Tex.*, 591 F.3d 431, 437 n.6 (5th Cir. 2009). Rather, it is the "the defendant who pleads the affirmative defense of absolute prosecutorial immunity [who] bears the burden of proving that the conduct at issue served a prosecutorial function." *Id.* (citing *Buckley*, 509 U.S. at 274); *see also Burns*, 500 U.S. at 486 ("[Our] decisions have also emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in

---

what this supposed false narrative concocted by the prosecutor in *Cousin* was, and we do not see one anywhere in the opinion. Rather, it appears that the witness's *defense lawyer* instructed the witness to falsely implicate Cousin in the murder, albeit at the prosecutor's behest, while the prosecutor merely instructed the witness to lie about the deal the State had offered and practiced the questions he would ask at trial. *Cousin*, 325 F.3d at 364. This matters, contrary to our brother's assertion, because it suggests that it was not the prosecutor who instructed the witness to testify falsely. In any event, the content of this instruction is markedly different from Perrilloux and Foster's "instruction" of Ashton. As recounted in detail above, the latter involved the fabrication of a wholly false narrative connecting Wearry to the scene of the crime, as well as the falsification of Ashton's statements by the prosecutor and detective. These differences matter because they bring Wearry's case within the facts of *Buckley*, which involved a conspiracy to manufacture witness testimony connecting the petitioner to the scene of the crime, rather than the facts of *Imbler*, which involved the knowing use of false witness testimony.

question."). But even putting that error aside, the facts in *Cousin* are materially distinguishable from the case at hand.

First, the alleged coercion in *Cousin* occurred during plea negotiations between the witness (who was facing charges from the same district attorney's office) and the prosecutor. *Cousin*, 325 F.3d at 634. A plea negotiation—in which charging, sentencing, and other purely prosecutorial decisions are bargained for—is quintessentially advocatory in function. Second, the prosecutor had initially advised the witness's defense attorney that his client would need to testify against Cousin in order to receive a reduced charge. The witness's own attorney is the one who in turn "advised him that he 'needed to give up [Cousin] on the murder.'" *Id.* The involvement of defense counsel, whose job is to advocate for the witness's interests, in the negotiation further casts the prosecutor's actions in an advocatory light. Finally, the elicitation of false testimony occurred during two meetings that were admitted to be express rehearsals for trial, wherein the prosecutor "provided me [the witness] with the questions I would be asked in court and the answers." *Id.*

Nothing like this occurred with respect to Ashton in Wearry's case. The six meetings between the defendants and Ashton were not rehearsals for trial or negotiations over Ashton's pending juvenile proceedings. There was no lawyer for Ashton present, nor any adult capable of advocating for the child's interests for that matter. Foster and Perrilloux were not merely reviewing the questions the prosecutor would ask Ashton at trial. Rather they were instructing him specifically what to say. They would tell Ashton "this is what you said before," and then repeat their false narrative until the child adopted it. To further intimidate Ashton, they took him to view the victim's blood-stained car and falsified the results of his response to the photo array. Nothing about these meetings resembles the plea negotiations in *Cousin*

where the witness practiced his false testimony with the prosecutor in exchange for leniency.[7]

Our brother's *dubitante* opinion contends these "razor-thin" distinctions are without a difference. *Infra* at 24. We disagree. This court has previously held that plea bargaining by a prosecutor falls within the scope of the judicial phase of the criminal proceeding and therefore absolute immunity attaches. *Humble v. Foreman*, 563 F.2d 780, 781 (5th Cir. 1977), *overruled on other grounds by Sparks v. Duval Cty. Ranch Co.*, 604 F.2d 976 (5th Cir. 1979); *Tubwell v. Dunn*, 12 F.3d 1097 (5th Cir. 1993) (unpublished). We are not, by any stretch, the only court of appeals to view plea negotiations as the distinct province of the prosecutor. *See Cady v. Arenac Cty.*, 574 F.3d 334, 341 (6th Cir. 2009) (collecting cases from Sixth, Second, and Tenth Circuits); *Knowlton v. Shaw*, 704 F.3d 1, 7–9 (1st Cir. 2013); *Davis v. Grusemeyer*, 996 F.2d 617, 629 (3d Cir. 1993); *Mendenhall v. Goldsmith*, 59 F.3d 685, 691 (7th Cir. 1995); *Romano v. Bible*, 169 F.3d 1182, 1187 (9th Cir. 1999). Our brother also claims that, under the functional approach, "the relevant question when it comes to prosecutorial immunity is whether the prosecutor was acting as an advocate or an investigator *as to Wearry*—not as to the witness." *Infra* at 25 (emphasis in original). We are doubtful this is in fact part of the functional test—our brother seems to derive it from the facts of *Cousin*, not from any legal precedent—but it hardly matters, because here

---

[7] Moreover, important differences in the procedural posture of this case make applying *Cousin* inappropriate. Though *Cousin* involved an appeal of a Rule 12(b)(6) dismissal on the basis of absolute immunity, *see* 325 F.3d at 630, the court declined to affirm this dismissal, instead affirming based on the summary judgment record, *id.* at 632. Thus, it is unclear how the *Cousin* court would have passed on Wearry's complaint, especially considering the fact that his complaint contains the very kinds of claims—"coerced testimony claim[s]"—that Cousin's complaint lacked. *Id.* In any event, applying *Cousin* here would be an expansion of the case, taking its summary judgment holding to preclude discovery by requiring judgment on the pleadings.

Perrilloux and Foster were acting as investigators as to Wearry when they fabricated testimonial evidence against him.

But our brother's primary theory about why *Cousin* dictates a different outcome here is his claim that the *Cousin* opinion articulates a two-step test which Perrilloux and Foster satisfy. Specifically, "a prosecutor accused of falsifying witness testimony is entitled to absolute immunity if he does so (1) after indictment or determination of probable cause, and (2) with the intent of presenting that testimony at trial." *Infra* at 22. Respectfully, *Cousin* articulated no such test. While both of the above elements existed in that case, the panel never held that they alone were sufficient to grant absolute immunity. Indeed, the latter element is mentioned *only twice* and merely in passing at that. Never does the prosecutor's intent appear as an analytical element in *Cousin*, so one may be forgiven for "miss[ing]" that about the opinion. *Infra* at 22. Instead, what "establishe[d] without genuine dispute" that the prosecutor was functioning as an advocate was the witness's statements that the prosecutor's coaching occurred during "practice" for trial where the prosecutor would "tell [the witness] how he should testify in court and to rehearse his testimony with him." *Cousin*, 325 F.3d at 634; *see also Genzler v. Longanbach*, 410 F.3d 630, 642–43 (9th Cir. 2005) (reading *Cousin* the same). The facts of *Cousin* that we have recited above, and which are not present in Wearry's case, confirm this.

Indeed, it would be strange for *Cousin* to have created the framework that our brother says it did. Neither of the two conditions he identifies—the existence of probable cause or the intent to use fabricated evidence at trial—is sufficient alone or in combination to entitle a prosecutor to absolute immunity. *See Buckley*, 509 U.S. at 274 n.5; 276. In fact, the latter has been squarely rejected as an improper consideration under the functional test. *Id.* at 276; *see also Fields*, 740 F.3d at 1114 (noting that such a rule "would create a 'license to lawless conduct,' which the Supreme Court has said that

qualified immunity is not to do."); *Burns*, 500 U.S. at 495 ("Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive."). This intent-to-convict is an element that almost always would be present, and thus automatically satisfied—why else would a prosecutor fabricate evidence if not to secure a conviction? More critically, it utterly fails to distinguish between investigatory and advocacy conduct which is *the inquiry* of the functional test—after all a police officer gathers evidence to, among other things, secure a conviction. This passing phrase, cherry-picked from *Cousin* cannot bear all the weight our that brother hangs on it.[8]

The principle distinguishing this case from *Cousin* that our brother says is lacking, *infra* at 24, is the principle that the Supreme Court and this court has repeated time and again: evidence gathering and creation is investigatory in nature, while evidence presentation and organization is advocacy. *See Buckley,* 509 U.S. at 273; *Singleton*, 956 F.3d at 783. Weary alleges, at base, that Foster and Perrilloux created fictitious testimony as false evidence to use against him. The district court was correct in concluding that

---

[8] Were we to apply our brother's framework to our most recent prosecutorial misconduct case, we would end up with a result contrary to what our court held. In *Singleton*, prosecutors with the Orleans Parish District Attorney issued fake subpoenas to coerce witnesses to testify. 956 F.3d at 777–78. In that case, there was both (1) probable cause and (2) an intent to secure evidence for trial—both of the elements which our brother says must compel a grant of absolute immunity. *Id*. at 782 (subpoenas' purpose of securing evidence); 783 (subpoenas issued "after charges had been filed in the underlying criminal case"); *infra* at 26 (*dubitante* noting the same). Yet, the panel denied absolute immunity in *Singleton*, expressly rejecting the prosecutors' argument that they were entitled to absolute immunity because the subpoenas were used to secure evidence for trial and probable cause had been established. Our brother's reading of *Cousin* cannot be squared with our court's precedent.

these facts do not compel an award of absolute immunity to District Attorney Perrilloux.

## C.

That leaves Detective Foster's invocation of absolute immunity. "The common law has never granted police officers an absolute and unqualified immunity[.]" *Pierson v. Ray*, 386 U.S. 547, 555 (1967). And as one would expect from that fact, neither has the Supreme Court or any other court. Foster argues that since he and Perrilloux are accused of committing the same fabricating acts, any entitlement the prosecutor might have for his actions the detective should have too. The Supreme Court has rejected this exact argument. In *Malley v. Briggs*, a police officer requested absolute immunity for his misconduct in seeking an arrest warrant, "draw[ing] an analogy between an officer requesting a warrant and a prosecutor who asks a grand jury to indict a suspect." 475 U.S. 335, 341 (1986). The Court acknowledged that there was "some force" to the analogy, but ultimately found it "untenable" to extend absolute immunity to police officers even in circumstances where a prosecutor would be protected by absolute immunity. *Id.* at 343; 342. Police, while important to the operation of the criminal legal system, are simply not so "intimately associated with the *judicial* phase of the criminal process" as to justify expanding absolute immunity beyond its common law boundaries. *Id.* at 342 (emphasis in original). Indeed, it is only "because any lesser degree of prosecutorial immunity could impair the judicial process itself," that prosecutors stand to benefit from absolute immunity. *Id.* (citing *Briscoe v. LaHue*, 460 U.S. 325, 334–35(1983)). A police officer, by contrast, "while a vital part of the administration of criminal justice, is further removed from the judicial phase of criminal proceedings than" a prosecutor. *Id.* There simply is not an analogous concern for the role that police officers play in a criminal prosecution.

To be sure, a police officer is entitled to absolute immunity when testifying as a witness in a criminal legal proceeding. *See Briscoe*, 460 U.S. at 345–46. But in that situation, he is not acting as a police officer, but rather as "any other witness sworn to tell the truth." *Id.* at 335–36. While testifying, an officer's role is simply that of a witness. Foster was neither a witness in this case, nor could he reasonably be viewed as playing the role of a prosecutor, that is "an advocate for the State." *Imbler*, 424 U.S. at 431 n.33. He provided no legal representation to the State, he would never have been allowed to advocate on the State's behalf in court, and he exercised no control over the State's decision to charge, present evidence, or otherwise prosecute the case. In short, his actions, though perhaps congruent with Perrilloux's, did not fulfill the same official function as the prosecutor's. Detective Foster, therefore, is not entitled to absolute prosecutorial immunity.

## IV.

Neither Detective Foster nor District Attorney Perrilloux is owed absolute immunity under the facts alleged in Wearry's complaint. The Supreme Court has made clear that police officers, even when working in concert with prosecutors, are not entitled to absolute immunity. Nor are prosecutors when they step outside of their role as advocates and fabricate evidence. The facts and actions alleged by the complaint are fundamentally investigatory in nature, and therefore absolute immunity is not warranted. For these reasons, we AFFIRM the district court's ruling denying Foster's and Perrilloux's motions for judgment on the pleadings based on absolute immunity.

JAMES C. HO, *Circuit Judge*, dubitante:

There are good reasons to believe that the doctrine of absolute prosecutorial immunity is wrong as an original matter. So I am tempted to join the majority and hold that prosecutorial immunity does not foreclose this case from proceeding to the merits.

But I am doubtful that governing precedent permits us to reach that result. The Supreme Court has repeatedly affirmed the doctrine of prosecutorial immunity. And our circuit has dutifully applied it—even in the face of disturbing claims of prosecutorial misconduct.

So I write separately, first, to explain how governing precedent requires us to grant prosecutorial immunity in this case, and second, to note that I reach this conclusion reluctantly, because the doctrine of prosecutorial immunity appears to be mistaken as an original matter.

**I.**

Prosecutors play a "special role . . . in the search for truth." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). Their "interest . . . in a criminal prosecution is not [to] win a case, but [to see] that justice shall be done." *Id.*

These unique obligations were flagrantly cast aside by the prosecutor in *Cousin v. Small*, 325 F.3d 627 (5th Cir. 2003). He allegedly "intimidated" a third party into giving false testimony in a calculated effort to secure a murder conviction and death sentence against Shareef Cousin. *Id.* at 632.

Yet we refused to even hear Cousin's constitutional claims against the prosecutor on the merits. We reasoned that the prosecutor was serving as an advocate, and not as an investigator, when he coerced false testimony from a witness, and was therefore entitled to prosecutorial immunity.

The case before us today involves this same awful narrative: Just as in *Cousin*, the prosecutor here deliberately coerced false witness testimony in order to secure a capital murder conviction against Michael Wearry.

Yet the panel today denies prosecutorial immunity—reasoning that coercing false testimony is an investigatory, and not an advocatory, function.

As an original matter, I might agree with that result. But I am unable to reconcile it with *Cousin*, which we are of course duty-bound to follow.[1]

### A.

It is well established that absolute prosecutorial immunity is "not limited 'only to the act of initiat[ing judicial proceedings] itself and to conduct occurring in the courtroom,' but instead includes *all actions 'which occur in the course of [the prosecutor's] role as an advocate for the State*.'" *Id.* at 632 (citation omitted, emphasis added). And under *Cousin*, it includes efforts to secure false testimony from a witness, after an accused has been indicted or probable cause has been determined. *Id.* at 633.

The panel majority makes much of the fact that, according to *Cousin*, a "determination of probable cause" is merely "a *significant factor* to be used in evaluating the advocatory nature of prosecutorial conduct." *Id.* (emphasis added).

A "significant factor" is no doubt different from a categorical rule. So I certainly agree with the majority that, under governing precedent, not *every* prosecutorial act under the sun is entitled to absolute immunity, just because it occurs after indictment. Our precedents leave room for the possibility that

---

[1] Whereas the state ultimately dismissed all charges against Cousin, *id.* at 630, Wearry pleaded guilty to manslaughter. He is now serving a 25-year prison sentence. So if prosecutorial immunity nevertheless bars Cousin's subsequent civil suit, there's no reason why it should not bar Wearry's suit as well.

*some* post-indictment acts could theoretically fall outside "the prosecutor's role as an advocate for the State." *Id.* at 632 (cleaned up).

Moreover, *Cousin* further observes that "many, perhaps most" witness interviews will be considered "advocatory," and thus entitled to prosecutorial immunity, so long as they are "conducted *after indictment.*" *Id.* at 633 (emphasis added). So perhaps "most," but notably not *all*, post-indictment witness interviews will be covered by prosecutorial immunity. For example, a prosecutor might interview an insignificant witness with no intention of ever using that interview for trial, and that interview might not be subject to prosecutorial immunity, even if it takes place after indictment.

So, to sum up: Not all prosecutorial acts after indictment are subject to absolute immunity—and in particular, not all witness interviews after indictment are subject to absolute immunity.

But here's what the panel majority misses about *Cousin*. In the concluding paragraph of the court's analysis, *Cousin* expressly states that, if a prosecutor allegedly conducts a witness interview with the "*inten[t] to secure evidence* that would be used in the presentation of the state's case at the pending trial of an already identified suspect," the prosecutor is "*entitled to absolute immunity* with respect to this claim." *Id.* at 635 (emphasis added).

So when a prosecutor is accused of coercing false witness testimony, "the question of absolute immunity *turns on*" two considerations: (1) "whether [the falsely accused] had been identified as a suspect at the time [of the prosecutorial misconduct]," and (2) "whether the interview related to testimony to be presented at trial." *Id.* at 633 (emphasis added).

In short, a prosecutor accused of falsifying witness testimony is entitled to absolute immunity if he does so (1) after indictment or determination of probable cause, and (2) with the intent of presenting that testimony at trial.

The majority essentially accuses me of making up this two-prong test. It insists that *Cousin* "articulated no such test." *Ante*, at 16. It is especially dismissive of any notion that "the prosecutor's intent appear[s] as an analytical element in *Cousin*." *Id.*

But it's not me, it's *Cousin*, that says that prosecutorial immunity "turns on" the two prongs of probable cause and prosecutorial intent. 325 F.3d at 633. It's not me, it's *Cousin*, that says that a prosecutor who satisfies these two prongs is "*entitled* to absolute immunity." *Id.* at 635 (emphasis added). The majority dismisses these statements as made only "in passing." *Ante*, at 16. But the first occurs after the court analyzes the governing precedent and then announces that absolute immunity "therefore" "turns on" the two elements of probable cause and prosecutorial intent. 325 F.3d at 633. And the second occurs in the concluding paragraph of the court's analysis, stating again the case satisfies these two prongs and that the prosecutor is "therefore" "entitled to absolute immunity." *Id.* at 635.

Moreover, a number of academic and legal commentators have construed *Cousin* the exact same way—prosecutorial immunity applies if a prosecutor (1) secures false witness testimony after probable cause is determined, and (2) intends to use that false testimony at trial. First, "prosecutorial actions taken after probable cause exists with respect to a suspect are properly characterized as advocatory and not investigative." William S. Helfand & Ryan Cantrella, *Individual Governmental Immunities in Federal Court: The Supreme Court Strengthens An Already Potent Defense*, 47 The Advoc. (Texas) 21, 22 (2009). So "the timing of the allegedly unlawful prosecutorial conduct is of the utmost importance." *Id.* Second, prosecutorial immunity is "resolved by evaluating the subjective intent of the prosecutor at the time of the misconduct—whether she intended to act as an investigator or an advocate." Margaret Z. Johns, *Reconsidering Absolute Prosecutorial Immunity*, 2005 B.Y.U. L. Rev. 53, 104 (2005). "[T]he

No. 20-30406

immunity that applies depends on the prosecutor's subjective state of mind at the time of the misconduct." *Id.* at 104-5. *See also When is prosecutor entitled to absolute immunity from civil suit for damages under 42 U.S.C.A. § 1983: post-Imbler cases*, 63 A.L.R.6th 255 (2011) (under *Cousin*, "prosecutor was entitled to absolute immunity" where "prosecutor's interview with witness was intended to secure evidence that would be used in the presentation of the state's case at the pending trial of an already identified suspect").

That is precisely what Wearry alleges here—after he was indicted, his prosecutor intentionally coerced a witness into testifying falsely against him. Accordingly, I see no choice but to grant absolute immunity in this case.[2]

**B.**

Applying this framework, it should be obvious why the panel majority's reliance on various cases—such as *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), *Burns v. Reed*, 500 U.S. 478 (1991), *Singleton v. Cannizzaro*, 956 F.3d 773 (5th Cir. 2020), *Wooten v. Roach*, 964 F.3d 395 (5th Cir. 2020), *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014), and *Milstein v. Cooley*, 257 F.3d 1004 (9th Cir. 2001)—is misplaced.

---

[2] Wearry's claim against the police officer also presents difficulties as a matter of precedent. To be sure, it may seem odd to apply prosecutorial immunity to anyone other than a prosecutor. But it's what governing precedents seem to contemplate. *See, e.g.*, *Buckley*, 509 U.S. at 276 ("When the functions of prosecutors and detectives are the same, . . . the immunity that protects them is also the same."); *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983) (granting absolute immunity to "a police officer [accused of] giving perjured testimony at [the plaintiff's] criminal trial"); *Morgan v. Chapman*, 969 F.3d 238, 244 (5th Cir. 2020) ("Chapman, of course, was not a prosecutor—she was a Medical Board investigator. But we approach absolute immunity functionally, looking to the nature of the acts and not the title of the actor.") (citing *Beck v. Tex. State Bd. of Dental Examiners*, 204 F.3d 629, 634 (5th Cir. 2000) (citing cases)).

No. 20-30406

In each of those cases, the alleged prosecutorial misconduct occurred *before*—and thus in the complete absence of—any indictment or determination of probable cause of wrongdoing by the plaintiff. *See Buckley*, 509 U.S. at 274 ("The prosecutors do not contend that they had probable cause"); *Burns*, 500 U.S. at 482, 492–96 (denying absolute immunity to prosecutor for giving legal advice to police prior to indictment or determination of probable cause); *Singleton*, 956 F.3d at 784 ("prosecutors allegedly violated the rights of victims and witnesses with no cases pending against them"); *Wooten*, 964 F.3d at 409 (prosecutor "admitted, after over a year of investigating, that he needed more time to gather enough evidence to indict"); *Fields*, 740 F.3d at 1110 (prosecutor's "alleged fabrication of testimony by a witness . . . led to Fields' indictment and trial"); *Milstein*, 257 F.3d at 1011 ("alleged conduct occurred . . . before the existence of probable cause"). So it's no surprise that prosecutorial immunity was denied in each of those cases.

By contrast, prosecutorial immunity was granted in *Cousin* because the prosecutor there allegedly engineered false witness testimony *after* indictment, and did so for the express purpose of using the testimony at trial. As the panel majority itself acknowledges, "the prosecutors in *Buckley* lacked probable cause to indict Buckley at the time they fabricated evidence, *while here Wearry had already been charged*." *Ante*, at 11 (emphasis added).

## C.

As a panel, we're bound to follow both Supreme Court and circuit precedent—whether we like it or not. Moreover, if fidelity to precedent means anything, it means construing precedent *faithfully*.

Of course, "judges can always draw razor-thin distinctions and contend that a particular issue is not governed by a non-originalist precedent." Josh Blackman, *Originalism and Stare Decisis in the Lower*

*Courts*, 13 NYU J.L. & LIBERTY 44, 51 (2019).  But "judges should resist this temptation."  *Id.  See also Williams v. Homeland Ins. Co.*, 18 F.4th 806, 821 (5th Cir. 2021) (Ho, J., concurring) (same).

I see no principled basis that the panel majority could possibly invoke to distinguish *Cousin*.  To the contrary, the theories put forth by the majority are directly contradicted by *Cousin* itself.

1.     The majority suggests that the prosecutorial misconduct in this case was meaningfully broader than that in *Cousin*.  As the majority puts it, the prosecutors here did "not simply . . . *elicit*[] false testimony"—they "*invented* a false narrative."  *Ante*, at 11 (emphasis added).

But the same is true in *Cousin*.  As we repeatedly emphasized there, the prosecutor "coerced and intimidated" a witness into "giv[ing] false trial testimony that would implicate Cousin."  *Cousin*, 325 F.3d at 632.  He "told him to lie about Cousin to avoid a lengthy sentence for armed robbery" for himself.  *Id.* at 634.  He "instructed" the witness on what to say, sitting down with him to "tell him how he should testify in court and to rehearse his testimony with him."  *Id.*  He "told [the witness] to implicate Cousin falsely in the murder and coached him on how to testify."  *Id.* at 635.

So if there's a principled distinction between the prosecutorial misconduct presented in this case and in *Cousin*, it's unclear to me what it is.

For its part, the majority responds by suggesting that, in *Cousin*, "it was not the prosecutor who instructed the witness to testify falsely," but rather "the witness's *defense lawyer*."  *Ante*, at 13 n.6.  That is a curious reading of *Cousin*, considering our court's repeated statements that the prosecutor was personally involved in "coerc[ing]," "intimidat[ing]," "instruct[ing]," "coach[ing]," and "rehears[ing]" with the witness to falsely testify against Cousin.  325 F.3d at 632, 634, 635.

No. 20-30406

Again, my reading of *Cousin* is supported by academic and legal commentary. *See*, *e.g.*, Johns, 2005 B.Y.U. L. Rev. at 104 ("In *Cousin v. Small*, the plaintiff alleged that prosecutors had coerced a witness to testify falsely, leading to his wrongful murder conviction."); Helfand & Cantrella, 47 The Advoc. (Texas) at 22 ("in *Cousin v. Small*, the Fifth Circuit held that two prosecutors were entitled to absolute prosecutorial immunity despite disconcerting allegations that they . . . encouraged witnesses to provide false testimony"); 63 A.L.R.6th 255 (in *Cousin*, "prosecutor's interview with witness was intended to secure evidence"). The majority itself admits that the witness's lawyer acted "at the prosecutor's behest." *Ante*, at 13 n.6.

In addition, the majority observes that, unlike *Cousin*, this case involves a "wholly false narrative" (as opposed to a merely *partial* false narrative, I gather). *Ante*, at 13 n.6. But I fail to see why the grant or denial of prosecutorial immunity would turn on the numerosity of false facts coerced by the prosecutor. I would have thought that it's the *fact* of the fraud and coercion that matters—not the frequency of the fraud and coercion. Certainly nothing in *Cousin* suggests otherwise.

2. The panel also tries to distinguish *Cousin* by noting that the prosecutor there procured false testimony during the witness's own plea negotiations. *Ante*, at 14. The panel further notes that the witness was represented by counsel in those discussions. *Id.* The implication is that the prosecutor there was engaged in the role of an advocate as to the witness, and not just as to Cousin.

But these considerations do not appear anywhere in the analysis in *Cousin*. And the panel does not claim otherwise.

So too here, the relevant question for applying prosecutorial immunity is surely whether the prosecutor was acting as an advocate or an investigator *as to Wearry*—not as to the witness.

After all, it's Wearry, not the witness, who is suing the prosecutor. It's Wearry, not the witness, who contests the prosecutor's invocation of prosecutorial immunity. So naturally it's the prosecutor's role toward Wearry, not the witness, that should dictate whether Wearry's suit is barred by prosecutorial immunity.

This is confirmed by both *Cousin* and *Singleton*. As we explained in *Cousin*, "the question of absolute immunity *turns on* whether *Cousin*"—not the witness against him—"had been identified as a suspect at the time [the witness] was interviewed." 325 F.3d at 633 (emphasis added). The court repeated the point: Our analysis turns on "whether *Cousin*"—not the witness against him—"had already been charged or arrested at the time of the . . . alleged" prosecutorial misconduct. *Id.* at 634 (emphasis added).

So the logic of *Cousin* is simply this: It was Cousin, not the witness, who brought suit against the prosecutor. And Cousin had been indicted. So we granted prosecutorial immunity.

This same framework also explains why we reached the inverse result in *Singleton*. There the suit was brought, not by an accused, but by innocent "crime victims and witnesses." 956 F.3d at 777. The suit accused prosecutors of using "fake 'subpoenas' to pressure crime victims and witnesses to meet with them." *Id.*

Naturally, by the time the prosecutors issued fake subpoenas to the victims and witnesses, they had already brought charges against various perpetrators. *See, e.g., id.* at 777 ("While the criminal case against the suspect was pending, a Defendant ADA . . . delivered a fake subpoena to [the victim]."). But those charges did not stop us from *denying* prosecutorial

immunity against the suit brought by the victims and witnesses—who, after all, were not charged or accused of anything. *See id.* at 784 (noting that there were "no cases pending" against any of the victims and witnesses who brought suit).

So *Singleton* presents the flip-side of the coin from *Cousin*: In *Singleton*, it was the victims and witnesses, not the perpetrators, who brought suit against the prosecutor. The victims and witnesses were not indicted or suspected of any crime. So we denied prosecutorial immunity accordingly.

The alignment of this case, of course, matches *Cousin*, not *Singleton*: As in *Cousin*, the suit here was brought by the accused, not the witness. So as in *Cousin*, the prosecutorial immunity analysis turns on the behavior and intentions of the prosecutor as toward the accused, not the witness. Precedent therefore dictates that we grant absolute immunity here, as in *Cousin*.

\* \* \*

None of this is to say that there's no principled way to allow Wearry's claims to proceed to the merits. It's just to say that the way to justify that result is *not* by faithfully following our governing prosecutorial immunity precedent, as we must. Rather, it's by concluding that the entire doctrine of prosecutorial immunity is simply wrong as an original matter, as only the Supreme Court can do. I will turn to that discussion next.

## II.

Worthy civil rights claims are often never brought to trial. That's because an unholy trinity of legal doctrines—qualified immunity, absolute prosecutorial immunity, and *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978)—frequently conspires to turn winnable claims into losing ones.

This case illustrates that conspiracy in action. Under the doctrine of absolute prosecutorial immunity, Wearry cannot bring suit against the prosecutor or the police officer who wrongly put him on death row. And that is so even if we assume (as we must at this stage) that the prosecutor and police officer engaged in a malicious campaign to coerce false testimony against him. Nor could Wearry sue the municipality that employed the prosecutor and police officer, because neither of them was operating pursuant to an official municipal policy or custom. *See id.* at 691 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy . . . caused [the] constitutional tort"); *id.* ("[A] municipality cannot be held liable under [42 U.S.C.] § 1983 on a *respondeat superior* theory.").

The good news for anyone outraged by this state of affairs is that the American people have a remedy. Congress decides what our laws shall be. Courts merely interpret and apply those laws. So if a court applies a rule of law that seems wrong and unjust, the people can demand that the legislative branch fix it.

In sum, Congress can abolish qualified immunity, absolute prosecutorial immunity, and *Monell*. And it can do so anytime it wants to.

The bad news is that, although Congress can fix what ails us in cases like this, it shouldn't have to. Because Congress never enacted the immunities that would presume to stop us from deciding Wearry's claims. As the Constitutional Accountability Center observes in its amicus brief, courts should construe provisions "in accordance with . . . text and history." So if we are going to recognize any immunities—notwithstanding the complete absence of any statutory text to support such immunities—at the very most we should recognize only those immunities that are "so well established in the common law . . . that the members of the 42nd Congress

must have been aware of them and could not have meant to abrogate them by implication." *See also*, *e.g.*, *Burns v. Reed*, 500 U.S. 478, 498 (1991) (Scalia, J., concurring in the judgment in part and dissenting in part) ("the presumed legislative intent not to eliminate traditional immunities is our only justification for limiting the categorical language of the statute"); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1870 (2017) (Thomas, J., concurring in part and concurring in the judgment) (same).

In short, this is a problem of the courts' own making.

Take the doctrine of qualified immunity. It requires civil rights plaintiffs to prove not only a violation of their constitutional rights, but a "clearly established" one. But the "clearly established" requirement lacks any basis in either the text or original understanding of § 1983. *See*, *e.g.*, *Horvath v. City of Leander*, 946 F.3d 787, 800–03 (5th Cir. 2020) (Ho, J., concurring in the judgment in part and dissenting in part); Scott A. Keller, *Qualified and Absolute Immunity at Common Law*, 73 Stan. L. Rev. 1337, 1388 (2021) ("The Supreme Court's largest departure from the common law of officer immunities occurred when *Harlow v. Fitzgerald* replaced the subjective good-faith defense for qualified immunity with a clearly-established-law test.").

The same can be said for absolute prosecutorial immunity. In 1871, when Congress enacted § 1983 into law, criminal cases were prosecuted by private parties, not public prosecutors. *See Kalina v. Fletcher*, 522 U.S. 118, 124 n.11 (1997). So we must determine what immunities a modern public prosecutor might have enjoyed, had they existed back in 1871.

There appear to be only two immunities at common law relevant to modern prosecutors: quasi-judicial immunity and defamation immunity. *See Burns*, 500 U.S. at 500–01 (Scalia, J., concurring in the judgment in part and dissenting in part). And neither of those immunities was anywhere near as

robust as absolute prosecutorial immunity. *See Kalina*, 522 U.S. at 132 (Scalia, J., concurring) ("There was[] . . . no such thing as absolute prosecutorial immunity when § 1983 was enacted."); *Rehberg v. Paulk*, 566 U.S. 356, 366 (2012) ("when the issue of prosecutorial immunity under § 1983 reached th[e] Court," it did not "simply apply the scope of immunity recognized by the common-law courts as of 1871 but instead placed substantial reliance on post–1871 cases extending broad immunity to public prosecutors sued for common-law torts"); Keller, 73 Stan. L. Rev. at 1367 ("While absolute immunity was frequently extended to government prosecutors throughout the rest of the twentieth century, the common law of 1871 had not recognized any such immunity.").

Quasi-judicial immunity protected the "quasi-judicial" acts of "government servants"—"official acts involving policy discretion but not . . . adjudication." *Burns*, 500 U.S at 500 (Scalia, J., concurring in the judgment in part and dissenting in part). So there's a good argument for extending quasi-judicial immunity to modern prosecutors today. *See id.* ("I do not doubt that prosecutorial functions, had they existed in their modern form in 1871, would have been considered quasi-judicial").

But at common law, quasi-judicial immunity could be defeated by a showing of malice. *Id.* And that is exactly what Wearry has alleged here—a malicious effort to falsify witness testimony against him in a capital murder trial. *See also Kalina*, 522 U.S. at 132 (Scalia, J., concurring) ("[Quasi-judicial immunity] was more akin to what we now call 'qualified,' rather than absolute, immunity.").

Nor does defamation immunity save the prosecutor here. Defamation immunity insulates all statements made during court proceedings. But it applies *only* to defamation claims. *See Burns*, 500 U.S. at 501 (Scalia, J., concurring in the judgment in part and dissenting in part). It does not shield

prosecutors against malicious prosecution claims. *Id.* at 504. To the contrary, at common law, "[a] private citizen who initiated or procured a criminal investigation could . . . be sued for the tort of malicious prosecution." *Kalina*, 522 U.S. at 132–33 (Scalia, J., concurring). *See also Rehberg*, 566 U.S. at 364 ("the generally accepted rule was that a private complainant who procured an arrest or prosecution could be held liable in an action for malicious prosecution") (quotations omitted).

So the upshot is this: Under an originalist view of § 1983, we should presumably allow Wearry's claim to proceed to the merits. But the doctrine of absolute prosecutorial immunity kills Wearry's suit. And if prosecutorial immunity didn't do the job, then qualified immunity presumably would. (And Wearry didn't even bother to sue the municipality, because *Monell* would have snuffed that claim out in an instant.)

That's wrong. Wearry's complaint plainly alleges a bad faith, malicious violation of his constitutional rights. That should be enough under the text and original understanding of § 1983 to proceed to the merits—even assuming that courts should apply at least those immunities that existed in the common law at the time of enactment.

\* \* \*

The majority says it is "strange" to apply prosecutorial immunity here. *Ante*, at 16. I agree. As explained, I'm skeptical about the doctrine of absolute prosecutorial immunity as an original matter. But a faithful reading of precedent requires us to grant it here, no matter how troubling I might personally find it.

As a panel, we're duty-bound to follow precedent. And that means we're duty-bound to follow precedent, full stop—not just when it leads to results we like. "[A] principle is not a principle until it costs you." *Lefebure v. D'Aquilla*, 15 F.4th 650, 663 (5th Cir. 2021) (citing PSALM 15:4 (honoring

those who "keep[ ] an oath even when it hurts")). "[F]ollowing precedent only when you like it—and ignoring it when you don't—is . . . not principled judging. It is the very definition of 'WILL instead of JUDGMENT'—*stare decisis* 'only when *I* say so.'" *Planned Parenthood of Greater Texas, Inc. v. Kauffman*, 981 F.3d 347, 386 (5th Cir. 2020) (Ho, J., concurring). It would "replace judicial hierarchy with judicial anarchy." *M.D. v. Abbott*, 977 F.3d 479, 483 (5th Cir. 2020).

Our precedents apply absolute prosecutorial immunity in cases just like this. The panel majority has nevertheless decided to allow this suit to proceed to the merits. As an originalist, I may cheer this result.[3] But I doubt that our prosecutorial immunity precedent permits it.

---

[3] I of course make no comment on the merits of this case—in particular, how Wearry's § 1983 claim should be decided in light of his admission of guilt for manslaughter and his subsequent 25-year prison sentence.